Hillsborough, June 25, 1943. } No. 3423.

ANDREW C. ELLIOTT & a.

*v.*

STANDARD ACCIDENT INSURANCE CO. & a.

*C. Bradley Frost*, for the plaintiffs, furnished no brief.

*Paul E. Nourie* (by brief and orally), for the defendant company.

*McLane, Davis & Carleton, J. Vincent Broderick* and *Thorp & Branch* (*Mr. Branch* orally), for the defendant Bourke.

PAGE, J. In the spring and early summer of 1940, Andrew C. Elliott was the registered owner of the beach wagon. He had made the trade for it, but it was paid for by the check of his son, Andrew C. Elliott, Jr. The latter was a minor engaged in business under the style of Ace Trucking Company. Registered in his name were several trucks used in that business. For the most part, if not wholly, the trades for these trucks had been made by the father, who had set his minor son up in business and who signed with the son all notes necessary to finance them. The beach wagon was used largely in the business of the Ace Trucking Company. There was no evidence of a partnership between father and son, as the court found, the father testifying that his interest was paternal.

For some years the Elliotts had placed their automobile liability insurance through Paul Sadler, who was general agent for both the defendant company and the Century Indemnity Company. As of June 1, 1940, the Century, through Sadler and his sub-agent Hanlon, had a policy on a Pontiac sedan registered in the name of the wife of Elliott, Sr. At that time, the defendant company had a policy on a Pontiac coupe registered in the name of Elliott, Jr., and upon two trucks registered in the name of the latter or the Ace Trucking Company. The trucking business, as of June 1, 1940, had just acquired, or planned to acquire, several other trucks, and as of August 28, 1940, the date of the accident, it had four trucks not covered by any policy of insurance.

The latter part of May or early in June, as the Elliotts testified, they conferred with Sadler about getting the necessary coverage. There was talk, as Sadler also testified, about the possibility of fleet coverage in order to effect some saving in premiums. Both Elliotts said that they left it to Sadler to determine the method of coverage, whether on the individual cars or upon the fleet. This was the findable situation, in which, given the custom of the business testified to, Sadler was left with complete authority to determine the manner of coverage of the cars that the Elliotts directed him to cover and that he agreed to cover.

During the trial there was much controversy, some of it not material, as to whether the beach wagon was owned by the elder Elliott alone, by the younger alone, or by both. If the elder owned it alone, the beach wagon could not go into fleet coverage. Upon the other alternatives, perhaps it could. But it makes little difference which way the fact were found; if Sadler had directions to cover the beach wagon, and he agreed to do so, he was bound to cover it, whether individually or as part of the fleet.

At this point comes the most serious conflict in the testimony. Elliott, Sr., insisted that he told Sadler at his first interview that he wished him to cover the beach wagon. Sadler and his witnesses denied this and testified that Elliott, Sr., told him that he did not wish to have the beach wagon insured. The jury were justified in believing Elliott. If they disbelieved Sadler and his witnesses, they could still believe that there was a meeting of minds, although Sadler denied it. Since there was still a necessity of ascertaining the numbers of the vehicles to be covered, the findable agreement was for insurance on all the cars as soon as the facts were ascertained, or within a reasonable time thereafter, individually or as a fleet as might seem proper to Sadler.

There is evidence that the Sadler Agency knew precisely the situation of the beach wagon as to insurance. On July 15, 1940, the State Commissioner of Motor Vehicles wrote to the defendant Company, "Andrew Elliott senior has a Ford beach wagon registered for 1940, No. 18–1785689 and he is not required to file." The last phrase meant that since Elliott, Sr., had not had an accident, the Commissioner did not require the filing of a certificate of coverage for that car. But since Elliott, Jr., had had an accident prior to that time, certificates of coverage were required for all of his cars. R. L., c. 122, s. 5. Obviously it could be found that the reason for furnishing this information to the defendant company was that the company was contemplating insuring the uncovered cars, and that this must have relation to the agreement theretofore made between the Elliotts and their general agent Sadler. A copy of this letter went to Sadler. He findably knew there was no certificate of insurance covering the beach wagon.

Sadler also findably knew that he had no policy on the beach wagon, and also that the Elliotts had no policies except through the agency. Sadler's office manager made up the list of all the Elliotts' cars at some time, and with a check-mark indicated which of them were insured. Insured were two trucks and the two Pontiacs, one of the latter owned by Elliott, Jr., the other by his mother, and so indicated on the list. Not checked as insured were four trucks and the beach wagon. Opposite the entry of the beach wagon was printed "NOT INS.," which Sadler and his office manager both testified meant "not insured." Sadler testified that this list had been in his office for at least a month prior to the accident, though his office manager thought not so long. But in any event, the State Commissioner of Motor Vehicles wrote to the Sadler Agency on July 31, four weeks prior to the accident, just what cars were registered in the names of Elliott, Sr., Elliott, Jr., and the Ace Trucking Company, stating as to the beach wagon "we do not know whether or not he [Sr.] is the owner of this car." So for weeks prior to the accident, there is evidence Sadler had full knowledge as to the identification of every car that he findably had promised to insure. The only thing that he did not know was possibly the legal ownership of the beach wagon, as to which he had warning from the Commissioner. As far as appears, he did not inquire into that during the ensuing weeks. Nor did he write policies on any one of the cars that he findably knew were not insured until after the accident.

Two days after the accident, in the morning, he filed with the Commissioner certificates covering the four trucks, drew up a policy

insuring them for one year from that date in the Standard, and sent to the defendant company copies of the policy and the certificates, requesting them to write a fleet policy covering the four trucks and those theretofore insured, to replace existing insurance on the individual cars. This policy Sadler never signed until October 30; and though he billed it to Elliott, Jr., on November 19 as a fleet policy, it was a policy on the individual cars. As far as appears, he had had no further orders from either of the Elliotts concerning this insurance after the negotiations many weeks prior to August 30.

As of October 3, also apparently without any further direction from either Elliott, Sadler wrote an individual policy in the Standard covering the beach wagon in the name of Elliott, Sr., and billed it to Elliott, Jr. As far as appears, Sadler did not then know a single fact about the ownership or non-insured character of this car that he did not know on July 15 or August 1. In other words he was in a position to write this policy weeks before the accident, in just as good a position as he was on October 3. If he had directions to insure the car prior to August 28, it might be found that there was not the slightest reason why it should not have been covered prior to that date.

It is clear that the Elliotts findably employed Sadler to cover all their cars, and that the choice of manner of coverage was left to him, also that it could be found that Sadler made an agreement whose performance within any reasonable time would have covered the beach wagon weeks prior to the accident. In accordance with the custom of the business that appeared from the testimony of both Sadler and the Insurance Commissioner, reasonable men in the plaintiffs' position might be justified in believing that Sadler had bound insurance on the car long before the accident.

The earlier cases frowned upon oral contracts for insurance, executed or executory, as tending to encourage fraud. But long practice in the business has discovered ample reasons for oral coverage, and the old rule has long since ceased to be. *Gerrish* v. *Insurance Co.*, 55 N. H. 355. Oral contracts, though executory, are now generally recognized and enforced, provided there is agreement upon the subject-matter, the parties, the risk insured, the amount, the time for the coverage to begin to run, the duration of the coverage, and the premium. As to these elements implication is enough without expression. The parties will be taken to contemplate those provisions contained in the policies usually issued in similar instances. The cases are collected in 15 A. L. R. 995; 69 A. L. R. 559, and 92 A. L. R. 232.

From the cases we conclude that the form of policy and the extent of the coverage as to use may be taken by fair implication to be those usually issued and approved in this State under the statutory regulation of the Insurance Commissioner. R. L., *c*. 122, *s*. 15. The date for the insurance to become effective, by fair implication, was within a reasonable time after the identity of the cars was established, if not immediately thereafter. The time of the coverage contemplated, if nothing was expressed, could be no other than the customary year. The premium to be paid would be the rate established under statutory authority. R. L., *c*. 329, *ss*. 13–16. None of these items could be matter of dispute, though never discussed by the Elliotts and Sadler. Similarly, the amount of coverage, if never discussed, could be neither more nor less than the standard $5,000 and $10,000 policy, which was just what the defendant company wrote on August 30 for the trucks, without, it could be found, specific agreement or direction of the Elliotts. To this point it is clear that reasonable men could by implication find nothing else, if in fact coverage was contemplated.

There was no mutually expressed designation of a company as the insurer. But the cases cited in the annotations referred to above make it clear that the determination of that element may be made by the agent under such circumstances, at any time before loss. Sadler, as general agent, had ample powers to decide which of his two companies should cover these cars, that being within the scope of his real or apparent authority. *Schwartz* v. *Casualty Co.*, 82 N. H. 177. He appears to have had full power to bind the defendant company by a written policy, subject to cancellation upon notice. Being the agent of the Elliotts also to choose which of his companies should insure, his decision would bind both the company and the Elliotts, whether the parties were informed of it at the moment or not. *Federal Insurance Co.* v. *Sydeman*, 82 N. H. 482. In all respects heretofore discussed the law appears to have given full recognition to the necessities of the insurance business if it is to be conducted with efficiency and risks are to be covered with the despatch demanded by the insured public.

It is urged that, since Sadler represented two principals, it cannot be found which one is bound. Superficially there would seem to be a difficulty, but the record discloses evidence that Sadler had in mind to write the policy or policies in the Standard. That is what he did when he got around to act, within thirty-six hours after the accident, with reference to the trucks. Further it is in evidence that, barring

Mrs. Elliott's car, the Century company did not enter into calculations, and that no other Elliott car had for more than a year been insured except in the Standard. The correspondence with the Boston office of the Standard as early as July 15 (and it was testified that there was much of it) might indicate that even at that date it was intended that further coverage should be in the defendant company, which was already interested in knowing what cars were not covered. This evidence is very persuasive as to Sadler's intention six weeks before the accident, and his actions on August 30 indicate no intervening change of mind.

Upon all the evidence, it was proper to deny the motions for directed verdicts, for judgment notwithstanding the verdict, and to set the verdict aside as far as the grounds assigned relate to the sufficiency of the evidence, the law and prejudice. The claim that the question submitted to the jury was indefinite will be disposed of later.

The company objected to the admission of evidence as to the intention and state of mind of Andrew C. Elliott, Sr., concerning ownership of the beach wagon traded for by him and registered in his name, though paid for by Elliott, Jr., out of the Ace funds and used largely in the Ace business. If in this ambiguous situation evidence of intention was not generally admissible (though see *Mitchell* v. *Smith*, 90 N. H. 36, 39; *Blake* v. *Lord*, 90 N. H. 42, 45), it was in the special circumstances. If, as could be found, Sadler agreed to insure the beach wagon individually or in the fleet as he should find proper, the question of title was ultimately important as bearing on the manner of coverage and in what name, matters concerning which, it could be found, Sadler should have inquired, and did not. It cannot be said that the jury were not entitled to know what Elliott would have told Sadler had Sadler inquired as he findably ought to have done.

The exception to Elliott, Senior's testimony that when he negotiated for and bought trucks, including the beach wagon, he intended them to be Junior's, stands the same. Senior was also properly permitted to explain that he signed notes with Junior to finance the trucks because Junior was a minor, not because the Ace business was Senior's. The court properly denied a motion to strike out a colloquy between the court and Elliott, Sr., bearing upon such intentions.

Sadler was permitted to testify that "the person getting the policy, would look to [him] to determine whether or not [he] covered him with a fleet policy or individual policies," and that this was the prac-

tice in the insurance business. The sole objection made was that only the people who sought insurance could best testify as to whom they looked. The Elliotts had already testified that they looked to Sadler. As to the practice, nobody knows that as well as people in the insurance business. There is not the least evidence that the Elliotts gave Sadler instructions in any sense contrary to the usual custom of the business except Sadler's testimony, which the court and jury could reject, that the talk was solely about fleet insurance. The argument that the first talk was about fleet insurance only, so that there could be no question of insuring the beach wagon unless it qualified for the fleet, ignores a part of the testimony. Sadler first raised the question of fleet coverage, while both Elliotts testified that they left it to him to decide whether there should be individual or fleet coverage. Elliott, Sr., testified that at the first conference he told Sadler specifically to cover the beach wagon and all other cars, and Elliott, Jr., testified that in June and on two later occasions he gave Sadler the number of the beach wagon and the numbers of the trucks. The company's theory seems to be that nothing can be considered except fleet coverage.

The defendant company's exception to the question submitted to the jury, as shown by the record, was based upon the following objections: (1) that the jury should be asked to find, if they found there was a contract to insure, whether the contract was with one or the other of the Elliotts, or both of them; (2) that they should determine whether any contract made was for individual or fleet coverage; (3) that they should decide whether Sadler had authority to cover the beach wagon in a fleet policy; (4) that they should decide whether Elliott, Sr., was the sole owner of the beach wagon; and (5) whether the Ace Trucking Company was operated solely by Elliott, Jr. In default of answers to these specific questions, they assert that the answer of the jury can be of no assistance whatever to the court in the final determination of the issues presented by the record. The answer is that none of these questions would be helpful except upon the company's theory that nothing can be found upon the evidence except a promise to give fleet coverage. The question submitted covered fairly all the material issues we are bound to find that the court should have submitted.

The defendant company requested the following instruction: "5. A principal is bound by his agent's act, only if it is one which agents in the same line of business are accustomed to do." We perceive no bearing of this unless in connection with the question properly not

.

asked the jury concerning the authority of Sadler to insure the beach wagon in a fleet policy. As to the general authority of Sadler there can be no question, and we shall not assume in advance that the court below will find that Sadler had authority to cover the beach wagon in the fleet under the regulations limiting his powers.

Two other requests require attention: "6. Use of an automobile by all members of the family where the automobile is registered in the name of Andrew Elliott, Sr., is of no evidentiary value in determining ownership. 7. In determining the question of ownership . . . you are instructed to consider statements made by Andrew Elliott, Sr. . . ." There was no evidence of use or ownership except by Elliott, Sr., or Elliott, Jr. It could be found that both indicated sufficiently to Sadler a desire to have the beach wagon insured, and a contract to insure could be found with the owner, under the question submitted, whether either or both owned the car. Moreover, the seventh request was granted verbatim, with the proper addition "and all other evidence with respect to said ownership."

The court's charge respecting Sadler's authority as general agent of the Standard company was excepted to on the sole ground that there was no evidence that Sadler acted for any particular company at the time of the alleged conversation relative to insurance. The material fact could be found that Sadler prior to the accident was acting for the Standard company.

*Exceptions overruled.*

BRANCH, J., did not sit: the others concurred.